ERIC A. POLLARD, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Pollard v. Commissioner
Docket Nos. 9634-78, 12467-79, 13797-79, 5137-80, 5209-80, 11203-80, 11204-80, 11326-80, 11557-80, 12091-80, 15293-80, 15294-80, 3329-81, 7482-81, 25426-81, 25428-81, 25496-81, 25610-81, 25615-81, 7530-82, 12738-82, 19015-82, 19263-82, 19272-82, 19281-82, 19285-82, 19291-82, 19833-82, 19887-82, 1945-83, 2042-83, 2138-83, 2178-83.
United States Tax Court
T.C. Memo 1984-536; 1984 Tax Ct. Memo LEXIS 137; 48 T.C.M. (CCH) 1303; T.C.M. (RIA) 84536; October 4, 1984. Lee Boothby, for the petitioners. Julian A. Fortuna, for the respondent. GOFFE MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: The Commissioner determined deficiencies in petitioners' Federal income tax and additions to tax as follows: Additions To Tax
Petitioner
Docket No.
Year
Deficiency
Amount
Code Sec. [2]
Eric A. Pollard
9634-78
1976
$3,415.00
19272-82
1979
3,276.00
$163.80
6653(a)
Kenneth R. Smith
12467-79
1976
2,037.54
509.39
6651(a)(1)
101.88
6653(a)
76.04
6654
John Wesley Foshee, Jr.
13797-79
1976
438.34
1977
765.00
Phillip R. Brooks
5137-80
1977
2,086.00
and Sharon O.
25428-81
1978
2,736.00
137.00
6653(a)
Brooks
2042-83
1980
3,350.00
167.50
6653(a)
167.50
6651(a)(1)
David D. Sutton
5209-80
1977
3,938.00
12738-82
1978
5,277.46
263.87
6653(a)
1979
5,622.34
1,395.59
6651
281.12
6653(a)
Larry F. McEver
11203-80
1977
2,913.00
Harold H. Johnston
11204-80
1977
3,074.00
and Josephine E.
25426-81
1978
3,843.00
192.00
6653(a)
Johnston
19281-82
1979
4,753.00
237.65
6653(a)
James F. Thompson
11326-80
1976
1,347.00
67.00
6653(a)
23.63
6654(a)
25610-81
1978
1,863.00
226.00
6651(a)(1)
93.00
6653(a)
19887-82
1979
2,398.77
119.94
6653(a)
1980
3,094.05
154.70
6653(a)
Michael W. Barton
11557-80
1976
1,562.00
391.00
6651(a)(1)
78.00
6653(a)
58.00
6654
1977
1,470.00
368.00
6651(a)(1)
74.00
6653(a)
54.00
6654
Robert E. Dollar, Jr.
12091-80
1977
1,811.00
and Linda Dollar
Robert E. Dollar, Jr.
19263-82
1979
2,071.00
104.00
6653(a)
1980
3,039.00
152.00
6653(a)
Robert E. McCurry
15293-80
1976
3,741.00
935.00
6651(a)(1)
187.00
6653(a)
1977
4,423.00
1,106.00
6651(a)(1)
221.00
6653(a)
Evelyn E. McCurry
15294-80
1977
3,200.00
800.00
6651(a)(1)
160.00
6653(a)
Robert D. McCurry and
3329-81
1977
1,965.00
Phyllis E. McCurry
1978
2,474.00
2138-83
1980
2,919.00
145.95
6653(a)
Robert D. May and
7482-81
1977
921.00
46.00
6653(a)
Jeanne W. May
Roger D. Schroeder
25496-81
1978
5,072.00
254.00
6653(a)
and Nancy L.
19285-82
1979
3,980.00
199.00
6653(a)
Schroeder
1980
5,457.00
273.00
6653(a)
Philip D. Thomason
25615-81
1978
3,004.00
150.00
6653(a)
Robert D. May
7530-82
1978
2,707.00
135.35
6653(a)
79.14
6654(a)
1979
10,559.00
527.95
6653(a)
431.59
6654(a)
Phillip R. Brooks
19015-82
1979
4,513.67
1,118.42
6651
225.68
6653(a)
Philip D. Thomason and
19291-82
1979
2,060.00
103.00
6653(a)
Anita J. Thomason
1945-83
1980
2,427.00
121.35
6653(a)
Alan D. Egerdahl and
19833-82
1979
2,092.00
104.60
6653(a)
Karen L. Egerdahl
1980
2,715.00
135.75
6653(a)
Eric A. Pollard and
2178-83
1980
3,798.00
189.90
6653(a)
Lee F. Pollard
*141 After concessions by the parties, the issues for decision are: (1) whether petitioners failed to report gross income during the taxable years in issue in the amounts determined by the Commissioner; (2) whether petitioners are entitled to deductions for charitable contributions pursuant to section 170(c) for any of the years in issue; (3) whether petitioners are liable for Federal Insurance Contributions Act (FICA) taxes for the years in issue; (4) whether petitioners are entitled to deductions for social security taxes for the years in issue; (5) whether petitioners are liable for self-employment taxes for the years in issue; and (6) whether petitioners are liable for the additions to tax determined by the Commissioner for the years in issue. FINDINGSOF FACT For convenience and organizational purposes, we have divided the Findings of Fact into a general findings of fact applicable to all petitioners and individual findings of fact which pertain only *142 to the indicated petitioners. Some of the facts have been stipulated. The stipulations of facts, supplemental stipulation of facts and second supplemental stipulation of facts and accompanying exihibits are so found and incorporated herein by reference. General
All of the petitioners resided in Georgia when they filed their respective petitions in this consolidated case. The Calvary Temple Church of East Point, Georgia, was formed in 1958. On or about August 31, 1960, Calvary Temple, Inc. (hereinafter referred to as "Calvary Temple," "Calvary Temple Church" or the "church"), was incorporated as "a church or religious society." The religious tenets of Calvary Temple are evangelical in nature. The King James version of the Holy Bible serves as the church's constitution and by-laws. Petitioner Robert E. McCurry is its first and only pastor. Regular weekly services are held at the church. At the time of trial, the church had approximately 300 members. All of the petitioners in this consolidated case are membersof the Calvary Temple Church. In addition to conducting regular weekly services at the church, petitioner Robert E. McCurry advances Calvary Temple's *143 evangelical crusade through other mediums. The church operates a "Go Ye For Christ Missionary Mobile Chapel" in the greater Atlanta, Georgia, metropolitan area. Pastor McCurry travels throughout the United States on missionary activities. Calvary Temple Church has operated a daily radio ministry. It also prepares taped sermons for individuals who are unable to attend its services.Finally, the Calvary Temple Church publishes the weekly newsletter "Temple Times." Although the "Temple Times" publication normally contains traditional evangelical religious articles, it has, it recent times and with increasing regularity, also included numerous articles concerning taxes, the Internal Revenue Service, governmental intrusion upon citizens' lives, religious instruction in public schools, accreditation of churchsponsored schools and religious freedom. The newsletter often contains copies of letters from congregation members to various public officials concerning these topics and frequently urges its readers to write to other public officials. The "Temple Times" has included articles entitled "Internal Revenue Service Must Be Abolished," "Fear the IRS" and "IRS Seeks Dictatorial Control *144 of Churches and their Ministers." Approximately 20 "religious orders"[3] are associated with the Calvary Temple Church. These "religious orders" are designated as "integrated auxiliaries of Calvary Temple" according to church literature. These "religious orders" are each comprised of members of one family. Not all of the members of Calvary Temple Church are members of one of these "religious orders." Membership in one of the associated "religious orders" is limited to those members of the local congregation who also satisfy additional "scriptural Godly qualifications." According to Pastor McCurry, members of these "religious orders" have "committed themselves in a special way for a special service in the ministry of the church, where they submit themselves completely to all of the activities of the church, and live under a distinctive discipline and rule of the church." All of the documentation concerning the formation of these "religious *145 orders" is identical, using forms printed by petitioner mIchael Barton on the church's printing machines and distributed to other church members. The forms associated with the creation of these "religious orders" include the following materials: STATEMENT OF CHRISTIAN FAITH AND APPLICATION Pastor McCurry, I have read all the materials relating to the Calvary Temple Religious Order and I believe the ministry is Godly and Scripturally sound. Because Jesus Christ lives, the Scriptures and the application of them to every area of creation without exception, are God's answers and Word today as they have always been, I believe that the establishing of a Christian Order (as presented in the By-Laws, Vows and Covenant) is both Scripturally sound and is a major development in presenting, proclaiming and claiming our God's reign, even our Lord Jesus Christ's. I concur that the involvement of and by uncivil civil 'administrator's' into family matters must be separated from by true and knowledgeable believers who serve the Lord Jesus Christ. My involvement has not been solicited nor have I been promised, nor do I expect, ease and comfort and immunity from hardship, sufferings *146 or persecutions; rather, I am fully aware that "all that will live godly in Christ Jesus shall suffer persecution" (II Timothy 3:13). I, therefore, of my own free-expression, desiring to live and "do all to the glory of God" (I Corinthians 10:31) request to be a part of the Calvary Temple Religious Order. For the Church's further consideration, I also submit the following testimony of both my conversion to Jesus Christ and my obediences to His Word: (Please use other side and additional paper if necessary). Sincerely presented, Name (Signature) Address Date IRREVOCABLE GIFTAND VOW OF POVERTY I,      , of (street) City: County: State: being sincerely desirous of bringing all matters into direct submission of the Word of God: The Old and New Testaments, as a baptized believer in the Lord Jesus Christ, and now realizing that God is both the Creator and true Owner of all property: which He does give into the temporary stewardship of men as it pleases Him (See Job 1:1-21; 41:11; Psalm 50:10-12; Genesis 24; Malachi 3:8-12; Matt. 6:19-33; I Cor. 10:26; Eph. 4:17-28; I Tim. 6:6-19; Titus 2:11-15; Peter 4:10; Psalm 23:1,2); FOR AND IN CONSIDERATION of *147 the blessings received from God and in obedience to a personal and practical application of Scriptural truth; DO HEREBY, freely, publically and IRREVOCABALLY give all that property(s): Real Estate, Automobile(s), Household Goods, Personal Items, Bank Accounts, Savings Accounts, Stocks and all future remuneration for church assigned services performed as an agent now and hereafter and all and any other property or monies appearing in my name, or may appear or does continue to appear in my name, except: to:       (An integrated auxiliary of Calvary Temple) with the firm hope in the Lord Jesus that it will be preserved for Godly uses in accordance with the Scriptures to the glory of God and to the furtherance of the proclaiming of the full counsel of God to men of all nations. I,       do hereby disavow any further autonomous ownership and take a VOW OF POVERTY. Note: While this initial gift and succeeding gifts here provided for are irrevocable and thus complying with irrevocable gift -- tax-exempt status, it is understood that I am a steward of all that God has entrusted to this Religious Order and therefore responsible to God to see that it is protected and preserved *148 for Godly and Scriptural use. Therefore, all gifts will revert to the giver instead of continuing in perpetuity if civil government officialdom were to "void" this act against my express will and intent as by invalidating my right to continue as a member, minister or official of the church/order, or by impeding the power of the church/order to designate after death succession to religious hierarchy, or by blocking the rightful tax-exempt maintenance of the church/order possessions in whatever way determined upon as in setting up other Christian Orders/churches anywhere/elsewhere in the created world, or by interfering in anyway with Biblical law rights and benefits as accorded to churches and orders and are the true right and priviledge of any religious body under the Constitution of the United States, and the First, Ninth, Tenth and Fourteenth Amendments thereof as rightfully accorded this church/order. (Copies of this instrumentwith my signature originally affixed thereto and dated shall be as valid as the original and no person or organization relying thereon shall be held responsible for the transfer, use or disposition or any payment whatsoever delivered hereunder. *149 ) Affiant's signature for Approval of Copies AFFIANT Legal Signature SPOUSE Legal Signature IN THE NAME OF JESUS CHRIST, amen (County) (State) (To be filed with the Church) This COVENANT made and entered into on the     day of      , 19   A.D.       Order, in integrated auxiliary of Calvary Temple, hereinafter termed Chruch and Society or Order 2560 Sylvan Road, East Point, Georgia 30344 Member and Covenanter, hereafter termed member. The parties hereto covenant as follows: 1. The member has requested the Order and Church accept the proffered Vow of Poverty and request for succor, advocacy, patronage, accommodation, coadjunance and subvention. 2. Member and Order have read the Order's By-Laws and agree to abide by both the letter and the intent thereof in light of the Holy Scriptures: the Old and New Testaments. 3. In view of that vow, the request and present and future Order-directed-labors, the Order will, in consonance with Scriptural teaching and guidance of the church, provide reasonable and modest allowances and/or other provisions for the member's housing, food, transportation, clothing, education and other needs as *150 may from time to time arise and as are affordable to the Order. Each party recognizes that God's providence does not preclude suffering, hardships and difficulties, for such does He mercifully use to our eternal good. 4. Should a member be or become married, have children or beget children, the Order will provide similar and appropriate allowances as per the aforegoing. (Marriage to unbelievers FORBIDDEN) 5. The covenanters recognize that this covenant is a matter of unalienable right, priviledge and immunity, that civil governments ought not regulate, inquire herein nor approve nor disapprove this holy matter claiming and asserting those gifts as God-given and also protected against any civil governmental interferance by the First through the Tenth Amendments & the sixth Article of the U.S. Constitution, the First and Second Psalm and other law constitutional. 6. Covenanters agree not to enter into any agreement, service or arrangement with any person, or combination of persons to alter or abridge the terms herein. 7. Covenanters acknowledge the immorality and offensiveness of so-called public Health, Education and Welfare programs. Included are similar programs *151 which make payments in event of physical death, disability, old-age or retirement or makes payments toward the cost of, or provide services for, medical care (including the benefits of any "insurance" program established by the Social Security Act, etc.) Such are acts of irreligion, theft, disbelief and usurpation. A person accepts such at the sure risk of dire consequences to him and his heirs.THEREFORE, no covenanter shall participate nor partake thereof in an amount greater than he has invested with a reasonable amount of interest. 8. Covenanters shall discharge their responsibilities in the fear of God and by His grace. 9. Covenanters acknowledge the clearness of the prohibitions of the Scriptures concerning adultry [sic], fornication, uncleanness, lasciviousness, idolatry, witchcraft, hatred, enmity, strife, gossip, jealousy, anger, selfishness, divisions (dissensions), heresies, envy, murders, drunkenness, carousing and the like and agree to eschew such. 10. Covenanters acknowledge that member may repudiate his vow by giving the Order and the church a written statement of that fact. Said repudiation to be effective when delivered to both.It is further agreed that *152 this covenant may be modified within the limits allowed by Scriptures by the mutual and written concurrance of all parties hereto. IN WITNESS WHEREOF, the Covenanters hereto have set their hands and seals the day and year first above written. Pastor Member Officer BY-LAWS of      , Chapter An integrated Auxiliary of Calvary Temple Religious Society Preamble: These are adopted by the Society in consonance with the purpose of Calvary Temple, a Church or Religious Society and a Georgia not-for-profit corporation; professing Biblical belief in the person, work and sovereignity of Jesus Christ the Lord (see Colossians), the comprehensive authority of the Old and New Testaments and desiring to bring all matters into submission thereto, I/we, the undersigned, do sincerely state personal faith in and obedience to Jesus Christ, having obeyed the scriptural command to "repent and believe in the Gospel" (Mark 1:15), acknowledging Jesus Christ as Lord and Saviour (Romans 10:8-13); Acts 5:31) and that I/we have been subsequently baptized in water. (Matt. 28:19; Mark 16:15,16, etc). Article I. Designation. The society is named Article II. Principal Office. The *153 principal office of this society is located at Article III. Membership. All members shall be professing, practicing Christians of historic Biblical faith (see II Thessalonians); living in obedience to the Biblical principals of holiness and separation (Hebrews 12:14,15; I Thessalonians 5; etc); who have been baptized subsequent to their conversion; who shall be active members of Calvary Temple fellowship in good standing and regularly attend the meetings and support the ministries with their tithes and offerings, excpet as hereinafter stated: (a) All children of members shall be members without further qualification until age 21. (b) Membership may be considered for persons who meet the qualifications in Article III, except that they do not live within the metropolitian [sic] area of Calvary Temple, therefore unable to attend, and have no approved fellowship to attend in their own area, but who shall follow a prescribed plan of scriptural study in their home as directed by the Pastor. (c) Membership may be considered for persons who meet the qualifcations in Article III except that they are members of an approved fellowship that bears a common-bond of Doctrine, fellowship *154 and spirit with Calvary Temple. Article IV. Officers. All officers shall be members and only officers shall be the voting members.All officers shall be professing, practicing Christians of historic Biblical faith (see II Thessalonians); living in obedience to the Biblical principals of holiness and separation (Hebrews 12:14,15; I Thessalonians 5: etc); who have been baptized subsequent to their conversion; who shall be active members of Calvary Temple fellowship in good standing and regularly attend the meetings and support the ministries with their tithes and offerings. The position of officers shall be for life except as otherwise noted or stated by an [sic] unanimous vote. Article V. Property. All property, income, etc. of the Order shall remain property of the Order. In case of dissolution, distribution shall be in accordance with Biblical principals and provisions stated in these By-Laws. Article VI. Disclaimer of autonomous ownership. This Biblical society is organized and operated exclusively for Christian religious purposes. No part of the net earnings of which inures to the atheistic benefit of any person or individual, no substantial part of the *155 activities of which is carrying on propaganda, or otherwise attempting to influence legislation, and which does not participate in, or intervene in (including the publishing or distribution of statements), any political campaign on behalf of any candidate for public office. Upon the dissolution or the winding up of the society, its assets, remaining after payment, or provision for payment, of all debts and liabilities, of this society, shall be distributed to a nonprofit fund, foundation, or corporation which is organized and operated exclusively for Christian religious purposes. * * * If this society holds any assets in trust, such assets shall be disposed of in such a manner as may be properly directed by Calvary Temple upon petition therefore by the society or by any person properly concerned therewith. ALL PROPERTY IS IRREVOCABLY DEDICATED TO BIBLICAL CHRISTIAN RELIGIOUS PURPOSES. Article VII. Discipline. Intra-society discipline shall be in accordance with the Scriptural admonitions and teachings. Inter-Church or this society and another integrated auxiliary or chapter of Calvary Temple discipline is limited to Biblical admonitions, exhortations, teachings and other Biblical *156 practices. (See Matthew 18:15-18; Galatians 6:1-5, etc). The civil law courts are not to be used in Intra-society or Inter-Church resolvement of conflicts or problems. (See I Corinthians 6:1).Divorce is not permitted except for Biblical reasons. The guilty and unrepentant party that is responsible for scriptural violations and divorce shall be stricken from membership and be deemed to have no future rights, benefits or otherwise under the society, the covenant and the church. Marriage to unbelievers is forbidden. Article VIII. Education. All children of members shall be provided only with Godly, Christian and academic education. Article IX. Revocation of Charter. The charter may be revoked by the unanimous vote of Calvary Temple Board of Directors for consistent unscriptural practices, teachings or beliefs not scripturally repented of as determined by said Board by written notice, but in none but the most heineous case, earlier than 3 months after giving that notice. Calvary Temple is not obligated to continue this relationship nor is the Society, and either may by the giving of a six months notice, in writing, terminate this holy Christian relationship and the *157 duties thereof. Article X. Changes to By-Laws. Articles I and II may be modified, altered, added to or otherwise changed by the unanimous consent and vote of the society's officer(s). The Preamble and Articles III through X may only be so changed with the written concurrance [sic] of the Calvary Temple Board of Directors. Adopted this     day of       19   A.D. at Signed: Name Title(s) Name Title(s) Name Title(s) Name Title(s) GOD IS WITNESS For Church use only: Calvary Temple by official action does/does not hereby recognize, accept and Charters the aforeidentified Christian religious society under the aforestated conditions, statements and testimony. Date: Charter issued: Pastor Calvary Temple Religious Society An Integrated Auxiliary of Calvary Temple
2560 Sylvan Road East Point, Georgia 30344 STATUTORY NOTICE pursuant to the I.R. Code, Section 3402(n) KNOW ALL MEN BY THESE PRESENTS that      , is a member of the Calvary Temple Religious Society, a Christian religious society and order. Similar to school teachers, legislators and numerous other groups not covered by the Social Security system, our *158 member likewise incurs no liability for FICA taxes. Also, due to the laws regarding this religious commitment as stated in the church's required conversion statement, by-laws, vow of poverty and covenant, our member is also EXEMPT from the withholding of Federal Income Tax and Unemployment taxes, if any. Section 3401 (a) (9) of the Internal Revenue Code exempts EMPLOYERS from the withholding of taxes on such remuneration. "The Term wages means all remuneration . . . for services performed by an employee for his employer, . . . except that term (wages) shall not include remuneration paid for services performed by a member of a religious order in the exercise of duties required by such order," See also sections 1402(e), 3121 (b) (8) (A), 1402 (c) (4), 7214 (willful oppression under color of law or demanding other or greater sums than are authorized by law), and Title 26 Code of Federal Regulations, paragraphs 31.3401 (a) (9) - 1d & 31.3121 (b) (8) - 1d.Since most employers, CPA's and the average IRS official are not familiar with these sections, they are included for convenience and legal notification. It is hereby CERTIFIED that the abovementioned member *159 is required by the church to perform missionary duties as      . Under the pertinent laws and regulations, "The nature or the extent of the services performed is immaterial if the member is required by the order to perform them." THEREFORE any withholding whatsoever of the aforementioned taxes from the remuneration of this member is in violation of the law and the free exercise of an American citizen's First Amendment privilege and rights and thus may subject erring Revenue Agents/Officers or employers to CIVIL and/or CRIMINAL penalties. Any advice to the contrary should be obtained in writing and signed. One may then be able to recover damages. NOW, based on STATUTORY NOTICE, law and the above CERTIFICATION employers are directed to cease forthwith the withholding of said taxes from this member's remuneration. IN WITNESS THEREOF, The Calvary Temple Religious Society has made, under its church seal and its authority by the hand of Robert McCurry, Pastor and ATTESTED by said official, the aforestated STATUTORY NOTICE and CERTIFICATION, the said official has hereunto set his hand and caused the church's seal to be affixed hereunto, this     day of by EFFECTIVE *160 DATE: (Valid for one year from       & with seal affixed) These forms were reviewed by the church's legal counsel, Teddy Ray Price, whose December 1977 opinion included the following language: I therefore advise you that while said forms may be proper, that alone does not preclude the Internal Revenue Service from filing claims to have said Orders overturned. Anyone creating such an Order does so at the risk of being challenged by the Internal Revenue Service and should not therefore hold me responsible in any way.If and when the Internal Revenue service decides to challenge these organizations, my services will be available in the defense of said organizations if you desire to retain my services. The "religious orders" associated with Calvary Temple Church do not co-mingle their assets with one another or with Calvary Temple Church. The members of each order retain complete control over their assets and income at all times. Although the members of some of these "religious orders" have opened checking accounts in their order's names and have transferred title to land and automobiles to their order, they still use and deal with these assets for personal purposes *161 as if they were in their own names. According to the pre-printed forms completed by petitioners in conjunction with the formation of their respective "religious orders," each of them has allegedly made a gift of all of their current and future real and personal property to their respective orders. Although the members of these "religious orders" do, in fact, exercise the same control over their real and personal property after the execution of the pre-printed "Irrevocable Gift and Vow of Poverty" forms as they did before these documents were signed, each order normally files an annual "Request for Allowances and Allotments" with Pastor McCurry. On these "requests," each order asks Pastor McCurry to approve their anticipated monthly living costs which are broken down into several categories. These anticipated monthly living costs are based upon the members' past financial experiences and always approximate their total income for that year. For all of the years in issue, no order submitted a "Request for Allowances and Allotments" which sought less than $1,000 per month. Further, no records are maintained by these "religious orders" to insure that the approved monthly *162 allowances are spent in accordance with the request. Calvary Temple has never obtained a determination from the Internal Revenue Service that it is an organization described in section 501(c)(3) or otherwise exempt from taxation. It also has never filed a form 990, Return of Organization Exempt from Tax, or Form 990T, Exempt Organization Business Income Tax Return, with the Internal Revenue Service.Calvary Temple has not filed any type of return with the Internal Revenue Service since 1977. Pastor McCurry has refused to permit the Internal Revenue Service to inspect the books and records of Calvary Church for the years in issue on religious grounds. Finally, for all of the years in issue, no written agreement existed between any of the petitioners and their respective "religious orders" regarding the diversion of any of petitioner's salary to Calvary Temple or to any "religious order." Petitioners Robert E.McCurry and Evelyn E. McCurry
During the years in issue, petitioner Robert E. McCurry worked as the pastor of Calvary Temple Church. He has been pastor of this church since he founded it in 1958. Prior to founding this church, he pastored the Assembly of *163 God Church in Augusta, Georgia. Petitioner McCurry has been involved with the ministry all of his adult life. Petitioner Robert E. McCurry devotes all of his time and effort to his work as pastor of the Calvary Temple Church. He has no written agreement with the church concerning his pastorship. As pastor of the Calvary Temple Church, the church provides all of petitioner Robert E. McCurry's living expenses.The church provides him with a home and automobile and also provides funds for their maintenance.The church also pays for his food expenses. Petitioner Robert E. McCurry uses the automobile for various ministerial activities and to visit congregation members. The church also pays for his membership in a group health medical plan and for his term life insurance. During the years in issue, petitioner Robert E. McCurry received $125 per week from Calvary Temple Church for expenses. Petitioner Evelyn E. McCurry, who is married to Pastor McCurry, also receives $100 per week from the church for expenses. Although she has no official position, she performs a wide variety of miscellaneous church duties including playing the organ, counseling and cleaning the church. *164 The sums received by petitioners were in addition to the home, automobile and related maintenance costs that are paid for by the church. Neither individual maintained any records of how these weekly allowances were spent. Petitioners Robert E. McCurry and Evelyn E. McCurry also occasionally received small gifts from members of their church. In 1976, petitioner Robert E. McCurry made a public declaration that he would live under a complete vow of poverty and obedience to the word of God. For the taxable year 1976, petitioner Robert E. McCurry filed a Form 1040, U.S. individual Income Tax Return, with various constitutional objections typed in the blanks requesting financial data. A large mass of "tax protestor" literature accompanied this form. On or about May 20, 1977, the Internal Revenue Service notified petitioner Robert E. McCurry by letter that the document he had submitted for the taxable year 1976 was not an acceptable return. Petitioner Robert E. McCurry has not filed a fully completed return for the taxable year 1976. Petitioners Robert E. McCurry and Evelyn E. McCurry have not filed any Federal income tax returns for the taxable year 1977. Utilizing Bureau of *165 Labor Statistics, the Commissioner determined that petitioner Robert E. McCurry earned taxable income of $14,830 and $15,483 in the taxable years 1976 and 1977, respectively. The Commissioner also determined that he was liable for self-employment taxes in the amounts of $1,172 and $1,233 for the taxable years 1976 and 1977, respectively. Finally, the Commissioner determined that the imposition of the additions to tax set forth above was warranted. Utilizing Bureau of Labor Statistics, the Commissioner also determined that petitioner Evelyn E. McCurry earned taxable income during the taxable year 1977 in the amount of $15,483. The Commissioner also determined that the imposition of the additions to tax set forth above was warranted. The resulting tax liabilities of these petitioners for the years in issue were computed assuming they were married yet filed separate returns. Petitioner Michael Barton
During the years in issue, petitioner worked for Calvary Temple Church. He began this service in 1971 after receiving a spiritual call. During the years in issue, petitioner performed a variety of services at the church including the operation of its printing machines *166 and the preparation of taped sermons. He printed the various forms used by the other petitioners when they created their own "religious orders." During the years in issue, petitioner received a weekly allowance of $50 for his expenses, which were to include his meals. The church provided him with living quarters during these years. Petitioner Michael Barton executed a pre-printed "Statement of Christian Faith and Application" which is dated January 1977. He also executed a pre-printed "Irrevocable Gift and Vow of Poverty" which is undated and purports to convey all of his current and future real and personal property to the "Michael Wayne Barton Christian Society," which is designated as "an integrated auxiliary of Calvary Temple. Petitioner signed a pre-printed "Covenant" which is dated January 1, 1977. In a document dated January 3, 1977, petitioner, acting as an officer of the "Michael Wayne Barton Christian Order" adopted pre-printed by-laws for his order. For the taxable year 1976, petitioner Michael Barton filed a form 1040, U.S. Individual Income Tax Return, with various constitutional objections typed in the blanks requesting financial data. A large mass *167 of "tax protestor" literature also accompanied this document. On or about May 20, 1977, the Internal Revenue Service notified petitioner by letter that the document he had submitted for the taxable year 1976 was not an acceptable return. Petitioner has not filed a fully completed return for the taxable year 1976. Petitioner did not file any Federal income tax return for the taxable year 1977. Utilizing Bureau of Labor Statistics, the Commissioner determined that petitioner earned taxable income in the amount of $11,122 for each of the taxable years 1976 and 1977. The Commissioner also determined that the imposition of the additions to tax set forth above was warranted. Petitioners Phillip Brooksand Sharon Brooks
During the years in issue, petitioner Phillip Brooks was employed by Delta Air Lines, Inc., as a customer services agent and received the following wages as remuneration for his services: Year
Amount
1977
$17,462.78
1978
20,076.93
1979
22,606.20
1980
24,486.20
Petitioner Phillip Brooks was paid by his employer for such services with checks whose named payee was "Phillip Brooks," and no other person had a right to cash these *168 checks. Petitioners Phillip Brooks and Sharon Brooks each executed a "Statement of Christian Faith and Application" which are dated January 1, 1977, and February 20, 1978, respectively. Petitioner Phillip Brooks executed a pre-printed "Irrevocable Gift and Vow of Poverty" which is dated January 1, 1977, and purports to convey all of his current and future real and personal property holdings to the "Brooks Christian Order," which is designated as "an integrated auxiliary of Calvary Temple." Although petitioner Sharon Brooks signed this latter document as petitioner Phillip Brooks' spouse, she did not, under the terms of the agreement, make any similar gifts of her property or undertake a vow of poverty. Petitioners Phillip Brooks and Sharon Brooks, acting as officers of the Brooks Christian Order, signed a pre-printed "Covenant" dated January 1, 1977. In a document also dated January 1, 1977, these same petitioners, again acting as officers of the Brooks Christian Order, adopted pre-printed by-laws for their order. During the taxable years 1977, 1978, 1979 and 1980, the Brooks Christian Order requested monthly allowances and allotments in the amounts of $1,093, $1,675, *169 $1,800 and $2,000, respectively. During the taxable years 1977, 1978, 1979 and 1980, petitioners Phillip Brooks and Sharon Brooks contributed $2,328, $5,907, $4,231 and $3,670, respectively, to the Calvary Temple. On or about September 22, 1978, petitioner Phillip Brooks executed a credit application with Fairburn Banking Company. On such application, petitioner Phillip Brooks listed his monthly gross income as $1,610 and made no mention of his vow of poverty or other religious undertakings. On or about July 13, 1979, petitioner Phillip Brooks executed an amendment to a loan application with the Federal Land Bank of Columbia. On such amendment, petitioner Phillip Brooks listed: (1) his income from employment with Delta Air Lines; (2) automobiles valued at $5,200; and (3) personal property valued at $4,000.He again made no mention of his vow of poverty or his other religious undertakings. On or about April 10, 1973, petitioner Phillip Brooks filed a Form W-4, Emplkoyee's Withholding Allowance Certificate, with his employer on which he claimed three withholding allowances. Beginning with the taxable year 1977, petitioner Phillip Brooks filed numerous Forms W-4 with *170 his employer in which he claimed additional withholding allowances as follows: Number of Withholding
Date
Allowances Claimed
January 1, 1977
25
August 1, 1977
27
January 1, 1978
27
April 28, 1978
27
On or about May 1, 1980, petitioner Phillip Brooks filed a Form W-4 with his employer in which he claimed to be exempt from withholding. Petitioners Phillip Brooks and Sharon Brooks filed joint Federal income tax returns for the taxable years 1977, 1978 and 1980. For the taxable year 1979, petitioner Phillip Brooks filed an individual Federal income tax return. On these returns, petitioners listed their occupations as members of a religious order. They did not report the receipt of any taxable wages during these years and, instead, indicated that any remuneration received was as the agent of Calvary Temple Church. For the taxable years 1977, 1978, 1979 and 1980, petitioners claimed deductions on their returns for contributions to Calvary Temple Church in the amounts of $27,962.78, $20,169.76, $22,606.20 and $24,486.20, respectively. Finally, petitioner Phillip Brooks filed a claim for refund for the taxable years 1977 and 1978 for Federal Insurance *171 Contributions Act (hereinafter referred to as "FICA") taxes withheld from his wages. The Commissioner determined that petitioner Phillip Brooks received taxable wages from Delta Air Lines, Inc., in the amounts set forth above for each of the taxable years in issue. The Commissioner also disallowed petitioners' claimed charitable contribution deductions for each of the taxable years in issue because it was not established that the amounts were, in fact, contributed to an organization within the purview of section 170. The Commissioner also rejected petitioner Phillip Brooks' claim that his wages were exempt from FICA taxes. Finally, the Commissioner determined that the imposition of the additions to tax set forth above was warranted. Petitioners Robert Dollar and Linda Dollar
During the years in issue, petitioner Robert Dollar was employed by N.C.R. Corporation as an engineer and received the following wages as remuneration for his services: Year
Amount
1977
$16,952.53
1979
19,081.98
1980
23,230.19
Petitioner Robert Dollar was paid by his employer for such services with checks whose named payee was "Robert E. Dollar," and no other person had a right *172 to cash these checks. Petitioner Robert Dollar executed an undated "Statement of Christian Faith and Application." He also executed a pre-printed "Irrevocable Gift and Vow of Poverty" which is dated January 1, 1977, and purports to convey all of his current and future real and personal property holdings to the "Robert E. Dollar Religious Order," which is designated as "an integrated auxiliary of Calvary Temple." His wife, petitioner Linda Dollar, did not sign this latter document although a blank for her signature is present. Petitioner Robert Dollar also filed a form entitled "Statutory Notice Pursuant to I.R. Code, Section 3402(n)" with his employer. Petitioner Robert Dollar signed a pre-printed "Covenant" dated January 1, 1977. In a document dated January 1, 1977, petitioners Robert Dollar and Linda Dollar, acting as officers of the "Robert E. Dollar Religious Order," adopted pre-printed by-laws for their order. During the taxable years 1977, 1979 and 1980, the Robert E. Dollar Religious Order requested monthly allowances and allotments in the amounts of $1,364.47, $1,591.70 and $1,889.85, respectively. During the taxable years 1977 and 1979, petitioners Robert *173 Dollar and Linda Dollar contributed $1,495 and $305 to the Calvary Temple. On or about September 22, 1977, petitioner Robert Dollar purchased a 1974 Chevrolet pickup truck and title to this vehicle was issued in the name of "Robert E. Dollar, Jr." On or about September 21, 1978, petitioner Robert Dollar filed a Form W-4, Employee's Withholding Allowance Certificate, with his employer on which he claimed 22 withholding allowances. Petitioners Robert and Linda Dollar filed joint Federal income tax returns for the taxable years 1977, 1979 and 1980. On these returns, petitioners listed their occupations as members of a religious order. They did not report the receipt of any taxable wages during these years and, instead, indicated that any remuneration received was as the agent of Calvary Temple Church. For the taxable years 1977, 1979 and 1980, petitioners claimed deductions on their returns for contributions to Calvary Temple Church in the amounts of $60,656.36, $21,081.98 and $23,230.19, respectively. Finally, for all of the taxable years in issue, petitioner Robert Dollar filed a claim for refund of FICA taxes withheld from his wages. The Commissioner determined *174 that petitioner Robert Dollar received taxable wages from his employer, N.C.R. Corporation, in the amounts set forth above.The Commissioner also disallowed petitioners' claimed charitable contribution deductions for each of the taxable years in issue because it was not established that the amounts were, in fact, contributed to an organization within the purview of section 170. The Commissioner also rejected petitioner Robert Dollar's claim that his wages were exempt from FICA taxes. Finally, the Commissioner determined that the imposition of the additions to tax set forth above was warranted. Petitioners Alan Egerdahl and Karen Egerdahl
During the years in issue, petitioner Alan Egerdahl was employed by Federal Express Corporation as a courier and received the following wages as remuneration for his services: Year
Amount
1979
$20,157.48
1980
22,854.02
Petitioner Alan Egerdahl was paid by his employer for such services with checks whose named payee was "Alan D. Egerdahl," and no other person had a right to cash these checks. Petitioners Alan Egerdahl and Karen Egerdahl each executed a "Statement of Christian Faith and Application" which *175 is dated January 1, 1977. Petitioner Alan Egerdahl executed a pre-printed "Irrevocable Gift and Vow of Poverty" which is undated and purports to convey all of his current and future real and personal property holdings to the "A. D. Egerdahl Christian Order," which is designated as "an integrated auxiliary of Calvary Temple." Although petitioner Karen Egerdahl signed the latter document as petitioner Alan Egerdahl's spouse, she did not, under the terms of the agreement, make any similar gifts of her property or undertake a vow of poverty. Petitioner Alan Egerdahl filed a form entitled "Statutory Notice Pursuant to I.R. Code, Section 3402(n)" with his employer. Petitioners Alan and Karen Egerdahl signed a pre-printed "Covenant" dated January 1, 1977.In a document also dated January 1, 1977, these same petitioners, acting as officers of the A. D. Egerdahl Religious Order, adopted pre-printed by-laws for their order. During the taxable years 1979 and 1980, the A. D. Egerdahl Christian Order requested monthly allowances and allotments in the amounts of $1,548 and $1,885, respectively. During the taxable years 1979 and 1980, petitioners Alan Egerdahl and Karen Egerdahl contributed *176 $610.50 and $574 to the Calvary Temple. On or about March 15, 1979, petitioner Alan Egerdahl filed a Form W-4, Employee's Withholding Allowance Certificate, with his employer on which he claimed 19 withholding allowances. During the years in issue, petitioner Alan Egerdahl's personal residence was in his own name. Subsequent to petitioner Alan Egerdahl's execution of the document entitled "Irrevocable Gift and Vow of Poverty," he borrowed $1,500 from the Bank of Covington and executed a deed to secure this debt with respect to his personal residence. In connection with this credit extension, he did not disclose that he was allegedly living under a vow of poverty and owned no assets and had no personal income. Petitioners Alan Egerdahl and Karen Egerdahl filed joint Federal income tax returns for the taxable years 1979 and 1980. On these returns, petitioners listed their occupations as members of a religious order. They did not report the receipt of any taxable wages during these years and, instead, indicated that any remuneration received was as the agent of Calvary Temple Church.For the taxable year 1979, petitioners claimed the following itemized deductions on *177 their return: Item
Amount
Medical & Dental premiums
$150.00
State and local income taxes
209.52
Real estate taxes
316.81
General sales tax
237.00
Social Security tax
1,230.29
Interest on rectory
2,062.00
Calvary Temple
15,951.86
For the taxable year 1980, petitioners claimed the following itemized deductions on their return: Item
Amount
Medical & Dental premium
$150.00
State and local income taxes
123.82
Real estate taxes
280.58
General sales tax
250.00
Social Security tax
1,398.86
Interest on rectory
2,038.23
Second mortgage
155.17
Calvary Temple
18,457.36
Finally, for all of the taxable years in issue, petitioner Alan Egerdahl filed a claim for refund for FICA taxes withheld from his wages. The Commissioner determined that petitioner Alan Egerdahl received taxable wages from his employer, Federal Express Corporation, in the amounts set forth above. The Commissioner also disallowed petitioners' claimed charitable contribution deductions for each of the taxable years in issue because it was not established that the amounts were, in fact, contributed to an organization within the purview of section 170. *178 The Commissioner also rejected petitioner Alan Egerdahl's claim that his wages were exempt from FICA taxes and disallowed petitioners' deductions for social security taxes. The Commissioner disallowed petitioners' remaining itemized deductions for the years in issue because they were less than the $3,400 zero bracket amount in effect for such taxable years. Finally, the Commissioner determined that the imposition of the additions to tax set forth above was warranted. Petitioner John Foshee
During the years in issue, petitioner John Foshee was employed by Kraft Foods, Inc., as a laborer and received the following wages as remuneration for his services: Year
Amount
1976
$4,782.78
1977
10,030.63
Petitioner John Foshee was paid by his employer for such services with checks whose named payee was "John W. Foshee," and no other person had a right to cash these checks. Petitioner John Foshee executed a pre-printed "Irrevocable Gift and Vow of Poverty" which is dated January 1, 1977, and purports to convey all of his current and future real and personalproperty holdings to the "Foshee Christian Order," which is designated as "an integrated auxiliary *179 of the Calvary Temple." Although his wife, who is not a party to these proceedings, also signed this document as petitioner John Foshee's spouse, she did not, under the terms of the agreement, make any similar gifts of her property or undertake a vow of poverty. Petitioner John Foshee and his wife, acting as an officer and a member, respectively, of the Foshee Christian Order, signed a pre-printed "Covenant" dated January 1, 1977. In a document also dated January 1, 1977, these same individuals, acting as officers of the Foshee Christian Order, adopted pre-printed by-laws for their order. Petitioner John Foshee filed a Form 1040, U.S. Individual Federal Income Tax Return for the taxable year 1976 with various constitutional objections typed in the blanks requesting financial data. A large mass of "tax protestor" literature also accompanied this document. Petitioner John Foshee and his wife filed a joint Federal income tax return for the taxable year 1977. On this return, they listed their occupations as members of a religious order. For the taxable year 1977, petitioners did not report the receipt of any taxable wages and, instead, indicated that any remuneration received was *180 as the agent of Calvary Temple Church. For the taxable year 1977, petitioner John Foshee and his wife claimed a deduction for contributions to Calvary Temple Church in the amount of $11,630.63. Finally, for the taxable year 1977, petitioner John Foshee filed a claim for refund for FICA taxes withheld from his wages. The Commissioner determined that petitioner John Foshee received taxable wages from his employer, Kraft Foods, Inc., in the amounts set forth above. The Commissioner also disallowed petitioner John Foshee's claimed charitable contribution deduction for the taxable year 1977 on the basis that it was not established that the sum was, in fact, contributed to an organization within the purview of section 170. The Commissioner also rejected petitioner John Foshee's claim that his wages were exempt from FICA taxes.Finally, the Commissioner determined that the imposition of the additions to tax set forth above was warranted. Petitioners Harold Johnston and Josephine Johnston
During the years in issue, petitioner Harold Johnston was employed by Eastern Air Lines, Inc., as a mechanic and received the following wages as remuneration for his services: Year
Amount
1977
$22,183.66
1978
24,915.20
1979
27,806.42
*181 Petitioner Harold Johnston was paid by his employer for such services with checks whose named payee was "H. H. Johnston," and no other person had a right to cash these checks. During the taxable years 1977, 1978 and 1979, petitioners Harold Johnston and Josephine Johnston maintained a joint account with the Eastern Airlines Employees Federal Credit Union and received the following amounts of taxable interest income: Year
Amount
1977
$584.45
1978
458.58
1979
565.15
Petitioner Harold Johnston executed a document entitled "Statement of Christian Faith and Application" which is dated September 20, 1977.Petitioner Harold Johnston also executed a pre-printed "Irrevocable Gift and Vow of Poverty," which is dated January 1, 1977, and purports to convey all of his current and future real and personal property holdings to the "Harold H. Johnston Religious Order," which is designated as "an integrated auxiliary of Calvary Temple." Although petitioner Josephine Johnston signed this latter document as petitioner Harold Johnston's spouse, she did not, under the terms of the agreement, make any similar gifts of her property or undertake a vow of poverty. *182 In an undated document, petitioners Harold Johnston and Josephine Johnston, acting as officers of the Harold H. Johnston Religious Order, adopted pre-printed by-laws for their order. During the taxable years 1977, 1978 and 1979, the Harold H. Johnston Religious Order requested monthly allowances and allotments in the amounts of $1,779, $1,848.63 and $2,275.23, respectively. During thetaxable years 1977, 1978 and 1979, these petitioners contributed $2,840.58, $3,377.50 and $2,933, respectively, to the Calvary Temple. Petitioners Harold Johnston and Josephine Johnston filed joint Federal income tax returns for the taxable years 1977, 1978 and 1979. On these returns, they listed their occupations as members of a religious order. They did not report the receipt of any taxable wages during these years and, instead, indicated that any remuneration received was as the agent of Calvary Temple Church. For each of these taxable years, petitioner Harold Johnston also filed a claim for refund of FICA taxes withheld from his wages. For the taxable years 1977, 1978 and 1979, petitioners claimed deductions on their returns for contributions to Calvary Temple Church in the amounts *183 of $102,058.66, $24,915.20 and $27,806.42, respectively. The Commissioner determined that petitioner Harold Johnston received taxable wages from his employer, Eastern Air Lines, Inc., in the amounts set forth above. The Commissioner also disallowed petitioners' claimed charitable contribution deductions for each of the years in issue because it was not established that the amounts were, in fact, contributed to an organization within the purview of section 170. For the taxable year 1979, the Commissioner also determined that petitioners received an additional $193 and $565 of interest income from the Internal Revenue Service and the Eastern Airlines Credit Union, respectively. The Commissioner also determined that petitioners $790received of income from the Prudential Insurance Company which they failed to report on their 1979 Federal income tax return. For all of the years in issue, the Commissioner rejected petitioner Harold Johnston's claims that his wages were exempt from FICA taxes. Finally, the Commissioner determined that the imposition of the additions to tax set forth above was warranted. Petitioners Robert D. McCurry and Phyllis McCurry
During the *184 years in issue, petitioner Robert D. McCurry was employed by Delta Air Lines, Inc., as a customer services agent and received the following wages as remuneration for his services: Year
Amount
1977
$17,658.76
1978
20,537.37
1980
24,725.40
Petitioner Robert D. McCurry was paid by his employer for such services with checks whose named payee was "Robert D. McCurry," and no other person had a right to cash these checks. Petitioner Robert D. McCurry executed an undated "Statement of Christian Faith and Application." He also executed a preprinted "Irrevocable Gift and Vow of Poverty" which is dated February 18, 1982, and bears a notation that a similar instrument was signed on January 1977, but was subsequently lost and that this replacement document is retroactiveto that date. This document purports to convey all of his present and future real and personal property holdings to the "Robert D. McCurry, Sr. Christian Order," which is designated as "an integrated auxiliary of Calvary Temple." Although petitioner Phyllis E. McCurry signed this latter document as petitioner Robert D. McCurry's spouse, she did not, under the terms of the agreement, make any *185 similar gifts of her property or undertake a vow of poverty. Petitioner Robert D. McCurry filed a form entitled "Statutory Notice Pursuant to I.R. Code, Section 3402(n)" with his employer. Petitioners Robert D. McCurry and Phyllis E. McCurry, acting as officers of the Robert D. McCurry Sr. Christian Order, signed a pre-printed "Covenant" which is dated January 1, 1977. In a document also dated January 1, 1977, these same petitioners, again acting in the same official capacity, adopted pre-printed by-laws for their order. During the taxable years 1977 and 1978, the Robert D. McCurry Sr. Christian Order requested monthly allowances and allotments in the amounts of $1,744 and $1,944, respectively. During the taxable years in issue, petitioners Robert D. McCurry and Phyllis E. McCurry made no contributions to the Calvary Temple. On or about November 21, 1977, petitioner Robert D. McCurry purchased a 1976 Ford automobile and took title in the name of "Robert D. McCurry, Sr." On or about November 3, 1981, March 8, 1982, July 13, 1982, and January 17, 1983, petitioner Robert D. McCurry submitted credit applications to the Delta Employees' Credit Union. On such applications, *186 he stated that he owned his personal residence and a 1976 Ford automobile. He made no mention of his vow of poverty or other religious undertakings. On or about April 22, 1977, petitioner Robert D. McCurry filed a Form W-4, Employee's Withholding Allowance Certificate, with his employer, Delta Air Lines, Inc., in which he claimed four withholding allowances. He filed additional Forms W-4 with his employer as follows: Number of
Date
Exemptions Claimed
July 19, 1977
23
April 24, 1978
24
October 17, 1980
24
Petitioners Robert D. McCurry and Phyllis E. McCurry filed joint Federal income tax returns for the taxable years 1977, 1978 and 1980. On these returns, petitioners listed their occupations as members of a religious order. They did not report the receipt of any taxable wages during the years in issue and, instead, indicated that any remuneration received was as the agent of Calvary Temple Church. For the taxable years 1977, 1978 and 1980, petitioners claimed charitable contribution deductions to Calvary Temple in the amounts of $33,795.76, $20,537.37 and $24,725.40, respectively. Finally, petitioner Robert D. McCurry filed a claim for refund *187 for each of the taxable years in issue for FICA taxes withheld from his wages. The Commissioner determined that petitioner Robert D. McCurry received taxable wages from his employer, Delta Air Lines, Inc., in the amounts set forth above. The Commissioner also disallowed petitioners' claimed charitable contribution deductions on the basis that it had not been established that petitioners had, in fact, made the contributions to an organization within the purview of section 170. The Commissioner also rejected petitioner Robert D. McCurry's claim that his wages were exempt from FICA taxes.Finally, the Commissioner determined that the imposition of the additions to tax set forth above was warranted. Petitioner Larry McEver
During the taxable year 1977, petitioner Larry McEver was employed by Gerald M. Leigh, Engineer, and received $15,529.60 of wages as remuneration for his services. Petitioner Larry McEver was paid by his employer for such services with checks whose named payee was "Larry F. McEver," and no other person had a right to cash these checks. Petitioner Larry McEver executed a pre-printed "Statement of Christian Faith and Application" which is dated January 1, *188 1977. He also executed a pre-printed "Irrevocable Gift and Vow of Poverty" which is also dated January 1, 1977, and purports to convey all of his current and future real and personal property to the "Larry F. McEver Order," which is designated as "an integrated auxiliary of Calvary Temple." Petitioner Larry McEver signed a pre-printed "Covenant" which is dated January 1, 1977. In a document dated January 1, 1977, petitioner Larry McEver, acting as an officer of the "Larry F. McEver Order," adopted pre-printed by-laws for his order. During the taxable year 1977, the Larry F. McEver Order requested a monthly allowance and allotment in the amount of $1,300. During the taxable year 1977, petitioner Larry McEver contributed $2,870 to the Calvary Temple. Petitioner Larry McEver filed an individual Federal income tax return for the taxable year 1977. On this return, he listed his occupation as a member of a religious order.He did not report the receipt of any taxable wages this year and, instead, indicated that any remuneration received was as the agent of Calvary Temple Church. For the taxable year 1977, petitioner claimed a charitable contribution deduction to Calvary *189 Temple in the amount of $21,594.58.Finally, petitioner Larry McEver filed a claim for refund for the taxable year 1977 for FICA taxes withheld from his wages. The Commissioner determined that petitioner Larry McEver received taxable wages from his employer, Gerald M. Leigh, Engineer, in the amount set forth above. The Commissioner also disallowed petitioner's claimed charitable contribution deduction on the basis that it had not been established that petitioner had, in fact, made the contribution to an organization within the purview of section 170. Finally, the Commissioner rejected petitioner's claim that his wages were exempt from FICA taxes. Petitioners Robert May and Jeanne May
During the years in issue, petitioner Robert May was employed by A C Delco Division, General Motors, as a parts man and received the following wages as remuneration for his services: Year
Amount
1977
$15,311.15
1978
14,079.49
1979
16,406.82
Petitioner Robert May was paid by his employer for such services with checks whose named payee was "Robert D. May," and no other person had a right to cash these checks. Petitioner Robert May executed a pre-printed "Statement *190 of Christian Faith and Application" which is dated August 11, 1977. He also executed a pre-printed "Irrevocable Gift and Vow of Poverty" which is dated February 1, 1977, and purports to convey all of his current and future real and personal property to the "Robert D. May Christian Order," which is designated as "an integrated auxiliary of Calvary Temple." Although petitioner Jeanne May also signed this latter document as petitioner Robert D. May's wife, she did not, under the terms of the agreement, make any similar gifts of property or undertake a vow of poverty. Petitioner Robert May signed a pre-printed "Covenant" which is dated February 7, 1977. During the taxable years 1977, 1978 and 1979, petitioners Robert May and Jeanne May contributed $2,128.75, $620.95 and $1,097.60, respectively, to the Calvary Temple and its affiliates. On or about July 27, 1977 and September 8, 1977, petitioners Robert May and Jeanne May purchased a 1974 Lincoln Continental and a 1972 International Travelall automobile, respectively, and titles to said vehicles were issued in the name of "Robert D. May." On or about July 27, 1977, September 9, 1977, July 24, 1978, October 1, 1979, and *191 November 20, 1979, petitioner Robert May submitted credit applications to Circle 10 Federal Credit Union. On such applications, he stated that he owned various automobiles and also listed his employment with A C Delco as a source of personal income. He made no mention of his vow of poverty or other religious undertakings. On or about July 20, 1979, petitioner Robert May transferred real property known as 2510 Springdale Road, Atlanta, Georgia, by warranty deed to Aaron B. Williams and Norma J. Williams. The total sales price was $40,000. Petitioners Robert May and Jeanne May filed a joint Federal income tax return for the taxable year 1977. On this return, petitioners listed their occupations as members of a religious order. They did not report the receipt of any taxable wages during this year and, instead, indicated that any remuneration received was as the agent of Calvary Temple Church.For the taxable year 1977, petitioners claimed a charitable contribution deduction to Calvary Temple in the amount of $39,111.15. Finally, petitioner Robert May filed a claim for refund for the taxable year 1977 for FICA taxes withheld from his wages. Petitioner Robert May did *192 not file Federal income tax returns for the taxable years 1978 and 1979. The Commissioner determined that petitioner Robert May received taxable wages from his employer, A C Delco Division, General Motors, in the amounts set forth above for each of the years in issue. The Commissioner also disallowed petitioners' claimed charitable contribution deduction on their 1977 joint Federal income tax return on the basis that it had not been established that petitioners had, in fact, made the contribution to an organization within the purview of section 170.For the taxable year 1979, the Commissioner determined that petitioner Robert May realized $40,000 of long-term capital gain. The Commissioner also determined that the imposition of the additions to tax set forth above was warranted. Petitioners Erie Pollard and Lee Pollard
During the years in issue, petitioner Eric Pollard was employed by Federal Express Corporation as a courier or ramp agent and received the following wages as remuneration for his services: Year
Amount
1976
$16.000.92
1979
19,507.33
1980
25,031.85
Petitioner Eric Pollard was paid by his employer for such services with checks *193 whose named payee was "Eric Pollard," and no other person had a right to cash these checks. Petitioners Eric Pollard and Lee Pollard each executed a pre-printed "Statement of Christian Faith and Application." Petitioner Eric Pollard also executed a pre-printed "Irrevocable Gift and Vow of Poverty" which is dated January 1, 1977, and purports to convey all of his current and future real and personal property to the "Pollard Christian Religious Order of Saints," which is designated as "an integrated auxiliary of Calvary Temple." Although petitioner Lee Pollard signed this latter document as petitioner Eric Pollard's spouse, she did not, under the terms of the agreement, make any similar gifts of her property or undertake a vow of poverty. Petitioner Eric Pollard filed a form entitled "Statutory Notice Pursuant to I.R. Code, Section 3402(n)" with his employer. Petitioners Eric Pollard and Lee Pollard signed a preprinted "Covenant" which is dated January 1, 1977. In a document also dated January 1, 1977, petitioners Eric Pollard and Lee Pollard, acting as officers of the "Pollard Christian Religious Order of Saints," adopted pre-printed by-laws for their order. On or *194 about February 24, 1978, petitioner Eric Pollard purchased a home for use as a personal residence which is located at 2262 Perkerson Road, Atlanta, Georgia, and title to said real property was held during the relevant years in issue in the name of Eric A. Pollard. On or about March 23, 1980, petitioner Eric Pollard purchased a 1978 Ford automobile and title was issued in the name of "Eric A. Pollard." On or about May 4, 1979, petitioner Eric Pollard filed with his employer, Federal Express Corporation, a Form W-4, Employee's Withholding Allowance Certificate, on which he claimed 19 withholding allowances. For the taxable year 1976, petitioner Eric Pollard filed a Form 1040, U.S. Individual Income Tax return, which contained various constitutional objections typed in the blanks requesting financial data. A large mass of "tax protestor" literature also accompanied this document. Petitioners Eric Pollard and Lee Pollard filed joint Federal income tax returns for the taxable years 1979 and 1980. On these returns, petitioners listed their occupations as members of a religious order. They did not report the receipt of any taxable wages during these years, and instead, *195 indicated that any remuneration received was as the agent of Calvary Temple Church. For the taxable year 1979, petitioners claimed the following itemized deductions on their return: Item
Amount
Medical & Dental premiums
$150.00
State and local income taxes
284.04
Real estate taxes
428.97
General sales taxes
196.00
Social Security taxes
1,171.80
Interest on rectory
1,707.19
For the taxable year 1980, petitioners claimed the following itemized deductions on their return: Item
Amount
Medical & Dental premiums
$150.00
State and local income taxes
714.48
Real estate taxes
372.47
General sales taxes
230.00
Social Security taxes
1,513.35
Interest on rectory
1,973.16
Finally, petitioner Eric Pollard filed a claim for refund for the taxable years 1979 and 1980 for FICA taxes withheld from his wages. The Commissioner determined that petitioner Eric Pollard received taxable wages from his employer, Federal Express Corporation, in the amounts set forth above. The Commissioner also disallowed petitioners' claimed charitable contribution deductions for the taxable years 1979 and 1980 on the basis that it had not been established that *196 petitioners had, in fact, made the contributions to an organization within the purview of section 170.The Commissioner also disallowed petitioners' 1979 and 1980 social security tax deductions and adjusted their remaining itemized deductions to conform with the zero bracket amounts in effect for those years. Finally, the Commissioner determined that the imposition of the additions to tax set forth above was warranted. Petitioners Roger Schroeder and Nancy Schroeder
During the years in issue, petitioner Roger Schroeder was employed by Ford Motor Company as a process engineer and received the following wages as remuneration for his services: Year
Amount
1978
$29,695.75
1979
27,745.58
1980
32,579.24
Petitioner Roger Schroeder was paid by his employer for such services with checks whose named payee was "R. D. Schroeder," and no other person had a right to cash these checks. Petitioner Roger Schroeder executed a pre-printed "Statement of Christian Faith and Application" which is dated November 23, 1977. He also executed a pre-printed "Irrevocable Gift and Vow of Poverty" which is dated January 4, 1977, and purports to convey all of his current *197 and future real and personal property to the "Roger Schroeder Christian Order," which is designated as "an integrated auxiliary of Calvary Temple."Although petitioner Nancy Schroeder also signed this latter document as petitioner Roger Schroeder's spouse, she did not, under the terms of the agreement, make any similar gifts of her property or undertake a vow of poverty. Petitioner Roger Schroeder filed a form entitled "Statutory Notice Pursuant to I.R. Code, Section 3402(n)" with his employer. Petitioner Roger Schroeder signed a pre-printed "Covenant" which is dated December 1, 1977. In a document dated November 23, 1977, petitioners Roger Schroeder and Nancy Schroeder, acting as officers of the "Roger Schroeder Christian Order," adopted pre-printed by-laws for their order. During the taxable years 1978, 1979 and 1980, the Roger Schroeder Christian Order requested monthly allowances and allotments in the amounts of $2,161.36, $2,312 and $2,600, respectively. During the taxable years 1978, 1979 and 1980, petitioners Roger Schroeder and Nancy Schroeder contributed $6,347.66, $3,476.75 and $4,782.25, respectively, to the Calvary Temple. Petitioners Roger Schroeder and *198 Nancy Schroeder filed joint Federal income tax returns for the taxable years 1978, 1979 and 1980. On these returns, petitioners listed their occupations as members of a religious order. They did not report the receipt of any taxable wages during these years and, instead, indicated that any remuneration received was as the agent of Calvary Temple Church. For the taxable years 1978, 1979 and 1980, petitioners claimed charitable contribution deductions to Calvary Temple in the amounts of $30,828.12, $27,745.58, and $32,579.24, respectively. Finally, petitioner Roger Schroeder filed a claim for refund for each of the taxable years in issue for FICA taxes withheld from his wages. The Commissioner determined that petitioner Roger Schroeder received taxable wages from his employer, Ford Motor Company, in the amounts set forth above. The Commissioner also disallowed petitioners' claimed charitable contribution deductions on the basis that it had not been established that petitioners had, in fact, made the contributions to an organization within the purview of section 170. The Commissioner also rejected petitioner Roger Schroeder's claim that his wages were exempt from FICA *199 taxes. Finally, the Commissioner determined that the imposition of the additions to tax set forth above was warranted. Petitioner Kenneth Smith
During the taxable year 1976, petitioner Kenneth Smith was employed as a subcontractor. He failed to cooperate with agents of the Internal Revenue Service in revealing the nature of his business dealings nor was he any more enlightening in responding to interrogatories propounded by respondent in these proceedings. Petitioner Kenneth Smith executed a pre-printed "Statement of Christian Faith and Application" which is dated January 1, 1977. He also executeda pre-printed "Irrevocable Gift and Vow of Poverty" which is also dated January 10, 1977, and purports to convey all of his current and future real and personal property to the "Kenneth R. Smith Christian Order," which is designated as "an integrated auxiliary of Calvary Temple." Although his wife signed this latter document as petitioner Kenneth Smith's spouse, she did not, under the terms of the agreement, make any similar gifts of her property or undertake a vow of poverty. Petitioner Kenneth Smith signed a pre-printed "Covenant" which is dated January 1, 1977. *200 In a document dated January 1, 1977, petitioner Kenneth Smith and his wife, acting as officers of the "Kenneth R. Smith Christian Order," adopted pre-printed by-laws for their order. Petitioner Kenneth Smith filed a Form 1040, U.S. Individual Income Tax Return, for the taxable year 1976. Instead of completing the form in accordance with Internal Revenue Service rules and regulations, petitioner Kenneth Smith typed in various constitutional objections in the blanks requesting financial data.A large mass of "tax protestor" literature also accompanied the form he submitted. The Internal Revenue Service informed petitioner in a letter dated May 23, 1977, that the form he submitted for the taxable year 1976 was not an acceptable tax return, yet he declined to submit a proper Federal income tax return for that year. Utilizing cost-of-living statistics published by the Bureau of Labor Statistics, the Commissioner determined that petitioner received $9,222 of taxable income during 1976. The Commissioner also determined that the imposition of the additions to tax set forth above was warranted. Petitioner David Sutton
During the years in issue, petitioner David Sutton *201 was employed by Delta Air Lines, Inc., as a customer services agent and received the following wages as remuneration for his services: Year
Amount
1977
$18,284.80
1978
20,491.58
1979
23,184.52
Petitioner David Sutton was paid by his employer for such services with checks whose named payee was "David D. Sutton," and no other person had a right to cash these checks. Petitioner David Sutton executed a pre-printed "Statement of Christian Faith and Application" which is dated January 1, 1977. He also executed a pre-printed "Irrevocable Gift and Vow of Poverty" which is dated February 19, 1982, but bears a notation that the original had been lost and that the replacement was retroactive to January 1977. This document purports to convey all ofhis current and future real and personal property to the "Sutton Christian Order," which is designated as "an integrated auxiliary of Calvary Temple." Petitioner also filed a form entitled "Statutory Notice Pursuant to I.R. Code, Section 3402(n)" with his employer. Petitioner David Sutton signed a pre-printed "Covenant" which is dated January 1, 1977. In a document dated February 19, 1982, which also indicates *202 that it replaces a lost original and is retroactive to January 1977, petitioner, acting as an officer of the "Sutton Christian Order," adopted pre-printed by-laws for his order. During the taxable year 1977, the Sutton Christian Order requested a monthly allowance and allotment in the amount of $1,645. During the taxable years in issue, petitioner filed several Forms W-4, Employee's Withholding Allowance Certificates, with his employer claiming the following withholding allowances: Number of
Date
Allowances
February 15, 1977
20
July 1, 1977
26
June 30, 1978
35
During the years in issue, petitioner owned, in his own name, a 1972 Plymouth automobile and a 1974 Suzuki motorcycle. Petitioner filed individual Federal income tax returns for the taxable years 1977, 1978 and 1979. On these returns, petitioner listed his occupation as a member of a religious order. He did not report the receipt of any taxable wages during the years in issue and, instead, indicated that any remuneration received was as the agent of Calvary Temple Church. For the taxable years 1977, 1978 and 1979, petitioner claimed charitable contribution deductions to Calvary Temple *203 in the amounts of $18,284.80, $20,491.58 and $23,184.52, respectively. Finally, petitioner filed a claim for refund for each of the taxable years in issue for FICA taxes withheld from his wages. The Commissioner determined that petitioner David Sutton received taxable wages from his employer, Delta Air Lines, Inc., in the amounts set forth above.The Commissioner also disallowed petitioner's claimed charitable contribution deductions on the basis that it had not been established that petitioner had, in fact, made the contributions to an organization within the purview of section 170. The Commissioner also rejected petitioner's claim that his wages were exempt from FICA taxes. Finally, the Commissioner determined that the imposition of the additions to tax set forth above was warranted. Petitioners Philip Thomason and Anita Thomason
During the years in issue, petitioner Philip Thomason was employed by Atlanta Gas Light Company as a commercial representative and received the following wages as remuneration for his services: Year
Amount
1978
$16,446.63
1979
17,895.28
1980
19,654.48
Petitioner Philip Thomason was paid by his employer for *204 such services with checks whose named payee was "P. D. Thomason," and no other person had a right to cash these checks. During 1979, petitioner Philip Thomason also received $119 of wages from Pinkertons, Inc.
Petitioner Philip Thomason executed a pre-printed "Irrevocable Gift and Vow of Poverty" which is dated April 9, 1978, and purports to convey all of his current and future real and personal property to the "P. D. Thomason Christian Religious Order," which is designated as "an integrated auxiliary of Calvary Temple." Petitioner Anita Thomason signed this latter document as petitioner Philip Thomason's spouse, although she did not, under the terms of the agreement, make any similar contributions of her property or undertake a vow of poverty. Petitioners Philip Thomason and Anita Thomason signed a preprinted "Covenant" which is dated April 9, 1978. In a document also dated April 9, 1978, petitioners Philip Thomason and Anita Thomason, acting, as officers of the "P. D. Thomason Christian Religious Order," adopted pre-printed by-laws for their order. During the taxable years 1978, 1979 and 1980, petitioners Philip Thomason and Anita Thomason contributed $1,691, $1,753 and $2,341, *205 respectively, to the Calvary Temple. During the years in issue, title to petitioner Philip Thomason's personal residence was in the name of "Philip D. Thomason." On or about April 6, 1978, petitioner Philip Thomason filed with his employer, Atlanta Gas Light Company, a Form W-4, Employee's Withholding Allowance Certificate, on which he claimed 19 withholding allowances. Petitioner Philip Thomason filed an individual Federal income tax return for the taxable year 1978. Petitioners Philip Thomason and Anita Thomason filed joint Federal income tax returns for the taxable years 1979 and 1980. On these returns, petitioners listed their occupations as members of a religious order. On his 1978 individual income tax return, petitioner Philip Thomason reported taxable wages of $5,013. Petitioners Philip Thomason and Anita Thomason did not report the receipt of any taxable wages during the taxable years 1979 and 1980 and, instead, indicated that any remuneration received was as the agent of Calvary Temple Church. For the taxable years 1978, 1979 and 1980, petitioners claimed charitable contribution deductions to Calvary Temple in the amounts of $30,203, $14,170 and $17,653, *206 respectively. For the taxable year 1979, petitioners also claimed the following itemized deductions: Item
Amount
Medical & Dental expenses
$501
State & local income taxes
466
Real estate taxes
291
General sales taxes
261
Personal property tax
291
Social Security tax
1,104
Interest on rectory
1,124 Finally, petitioner Philip Thomason filed aclaim for refund for each of the taxable years in issue for FICA taxes withheld from his wages. The Commissioner determined that petitioner Philip Thomason received taxable wages from his employers, Atlanta Gas Light Company and Pinkertons, Inc., in the amounts set forth above. The Commissioner also disallowed petitioners' claimed charitable contribution deductions on the basis that it had not been established that petitioners had, in fact, made the contributions to an organization within the purview of section 170. The Commissioner also rejected petitioner Philip Thomason's claim that his wages were exempt from FICA taxes. For the taxable year 1979, the Commissioner disallowed petitioners' deduction for social security taxes and disallowed the remaining itemized deductions because they totaled less *207 than the zero bracket amount. Finally, the Commissioner determined that the imposition of the additions to tax set forth above was warranted. Petitioner James Thompson
During the years in issue, petitioner James Thompson was employed by Great A & P Tea Company, Inc., Georgia Lift Company, Inc., Toddlers Kollege, Inc., and Colonical Stores, Inc., and received the following wages as remuneration for his services: Year
Amount
1976
$11,673.54
1978
14,807.02
1979
17,757.12
1980
18,929.84
Petitioner was paid by his employers for such services with checks whose named payee was "James F. Thompson," and no other person had a right to cash these checks. Petitioner executed a pre-printed "Statement of Christian Faith and Application" which is dated January 1, 1977. He also executed a pre-printed "Irrevocable Gift and Vow of Poverty" which is undated and purports to convey all of his current and future real and personal property to the "James F. Thompson Christian Order," which is designated as "an integrated auxiliary ofCalvary Temple." Petitioner signed a pre-printed "Covenant" which is dated January 1, 1977. In a document also dated January 1, 1977, petiioner, *208 acting as an officer of the "James F. Thompson Christian Order," adopted pre-printed by-laws for his order. During the taxable year 1980, petitioner contributed $132.50 to the Calvary Temple. On or about February 1, 1980, petitioner purchased a 1977 Buick automobile taking title in the name of "James F. Thompson." During the years in issue, petitioner submitted numerous credit applications to the Colonial Stores Employees' Credit Union. On such applications, petitioner did not disclose his vow of poverty and indicated that he owned real and personal property. Petitionerfiled individual Federal income tax returns for the taxable years 1976, 1978, 1979 and 1980. For the taxable year 1976, petitioner filed a Form 1040, U.S. Individual Income Tax Return, with various constitutional objections typed in the blanks requesting financial data. For the taxable years 1978, 1979 and 1980, petitioner listed his occupation as a member of a religious order. He did not report the receipt of any taxable wages during the taxable years 1978, 1979 and 1980 and, instead, indicated that any remuneration received was as the agent of Calvary Temple Church. For the taxable year 1978, petitioner *209 claimed a charitable contribution deduction to Calvary Temple in the amount of $14,807.02. Finally, petitioner filed a claim for refund for the taxable years 1978 and 1979 for FICA taxes withheld from his wages. The Commissioner determined that petitioner received taxable wages from his employers in the amounts set forth above. The Commissioner determined that petitioner was liable for self-employment tax for the taxable year 1976 in the amount of $261.The Commissioner also disallowed petitioner's claimed charitable contribution deduction on the basis that it had not been established that petitioner had, in fact, made the contribution to an organization within the purview, of section 170. The Commissioner also rejected petitioner's claim that his wages were exempt from FICA taxes. Finally, the Commissioner determined that the imposition of the additions to tax set forth above was warranted. OPINION Issue 1. Receipt of Taxable Income
The first issue for decision is whether petitioners Eric Pollard, Kenneth Smith, John Foshee, Phillip Brooks, David Sutton, Larry McEver, Harold Johnston, James Thompson, Robert Dollar, Robert D. McCurry, Robert May, Roger *210 Schroeder, Philip Thomason, Alan Egerdahl, Michael Barton and Robert E. McCurry received taxable income during the years in issue. For discussion purposes, we will address these petitioners' similar issues as a whole and separately discuss any additional taxable income issues which are peculiar to the indicated petitioners. General
Petitioners contend that they did not receive taxable income as determined by the Commissioner. They argue that any remuneration received for their services performed for third parties was as the agent of their respective "religious orders," which are "integrated auxiliaries" of Calvary Temple Church. Petitioners rely heavily upon Office Decision 119, 1 C.B. 82 (1919), which provides as follows: A clergyman is not liable for any income tax on the amount received by him during the year from the parish of which he is in charge, provided that he turns over to the religious order of which he is a member, all the money received in excess of his actual living expenses, on account of the vow of poverty which he has taken. Members of religious orders are subject to tax upon taxable income, if any, received by them individually, *211 but are not subject to tax on income received by them merely as agents of the orders of which they are members. [4]
Petitioners contend that the record reflects that Calvary Temple Church, acting through petitioner Pastor Robert E. McCurry, has the ultimate authority and control over the activities of petitioners' "religious orders." This control allegedly includes petitioners' activities even while working for third parties. If a conflict arises between the pastor and the third party employer, that member of the "religious order" must follow the direction and authority of the pastor.Therefore, petitioners claim that, if the church, as a practical matter, determines for whom and in what capacity and for how long a member will remain in a position, then any compensation received for rendering services to a third party should not be included in that member's income as he is merely acting as an agent of his "religious order," which is an integrated auxiliary of Calvary Temple Church. Respondent contends that these petitioners received taxable income in their individual *212 capacity and not as agents of "religious orders" living under a vow of poverty. He claims that these petitioners' "religious orders" had no separate existence from them as individuals. The only funds received by these "religious orders" were compensation from third parties for services performed by these individual petitioners, and these funds were generally used by these petitioners for their personal living expenses. Further, these "religious orders" maintained no books and records. There also were no written agreements between Calvary Temple and these petitioners requiring the diversion of their salaries to the church. Finally, payment for these petitioners' services was transmitted to them in the form of checks payable in their own names; no one other than these petitioners had a right to cash these checks. Based upon these facts, respondent argues that petitioners were not agents of Calvary Temple for Federal income tax purposes. In McGahen v. Commissioner,76 T.C. 468 (1981), affd. without published opinion 720 F.2d 664 (3d Cir. 1983), we examined a similar factual setting and claim that a taxpayer received his salary as an agent *213 of a "religious order." There, the taxpayer formed his own "auxiliary church" (Chapter 7807) to the Basic Bible Church of America; he executed a vow of poverty whereby he purportedly transferred all of his assets, including wages, to Chapter 7807; he was instructed by an official of the Basic Bible Church of America to continue his work as a boilermaker; he deposited all of his wages into a checking account in the name of Chapter 7807; and he and his wife used these funds to pay their personal, living and family expenses. We rejected the taxpayer's claim that he merely received his wages as an agent of church and stated that: When an agent receives income for a principal, it is the income of the principal, not the agent. Maryland Casualty Co. v. United States,251 U.S. 342 (1920). Likewise, when a member of a religious order receives income on behalf of that order and, pursuant to a vow of poverty, turns it over to the order, it is the income of the order and not the member. Where, however, there is no agent-principal relationship, it is a basic rule of tax law that an assignment by a taxpayer of compensation for services to another person is ineffectual *214 to relieve the taxpayer of Federal income tax liability on such compensation regardless of the motivation behind the assignment. Lucas v. Earl,281 U.S. 111 (1930). See also Helvering v. Horst,311 U.S. 112 (1940); Helvering v. Eubank,311 U.S. 122 (1940). This is where petitioner's argument collapses. The income received by him was not received on behalf of a separate and distinct principal, but was received by him in his individual capacity. Although he made a vow of poverty, the manner in which he handled his economic and financial affairs was the same as it was before he was ordained and chartered as a "church personally." He had no limitations on the use of his earnings. There was no accounting to assure the frugal and ascetic life of one who takes a vow of poverty of what was earned and how it was spent. Chapter 7807 was an attempt at creating an "incorporated pocketbook." See Helvering v. Clifford,309 U.S. 331 (1940). Clearly, petitioner earned his wages in his individual capacity.[76 T.C. at 478-479.] Given the factual similarity between the immediate petitioners and the taxpayer in *215 McGahen,[5] we must hold that these petitioners have also failed in their burden of proving that their receipt of remuneration from third parties for services rendered was merely as the agent of Calvary Temple Church. Rule 142(a). Although eachof these petitioners executed a vow of poverty, they continued to handle their economic and financial affairs and assets in the same manner before and after their execution of their vows of poverty.In many instances, automobiles and real property remained in petitioners' name or were purchased in their individual capacity during the years in issue. Further, there is no evidence that these petitioners actually did live under a vow of poverty. For the years in issue, none of these petitioners submitted a "Request for Allowances and Allotments" which sought less than $1,000 per month. In many cases, the requested "allowances" (which were *216 all approved by Pastor McCurry) exceeded $2,000 per month. Such sums hardly disclose a life of frugality under a vow of poverty. Further, there were no limitations on petitioners' use of their "allowances" and no accounting of how these "allowances" were spent. There also was no satisfactory explanation of why petitioners' requested "allowances" always approximated their income for the years in issue. Although many of these petitioners do, in fact, adhere to the teachings of Calvary Church and devote a great deal of their personal time to evangelical activities associated with the church, it does not alter the Federal income tax consequences associated with their receipt of remuneration for services performed for third parties. Therefore, the Commissioner's determinations that these petitioners received taxable income in their individual capacity and not as agents of Calvary Temple Church are sustained. McGahen v. Commissioner,supra.
As to the amount of taxable income received by these petitioners as remuneration for services performed for third parties, all of these petitioners, with the exception of petitioner Kenneth Smith, have stipulated *217 to their respective amounts of taxable income. As these stipulated amounts do not vary from the Commissioner's determinations, the Commissioner's determinations of the amount of taxable income received by these petitioners as remuneration for services performed for third parties for the years in issue (with the exception of Kenneth Smith), are sustained. Kenneth Smith
With respect to petitioner Kenneth Smith, due to his self-employment as a subcontractor, refusal to stipulate as to the amount of taxable income received during the taxable year 1976 and refusal to produce records concerning his income-earning activities for this year, the Commissioner determined his taxable income utilizing Bureau of Labor Statistics. This petitioner presented no evidence or argument on brief contesting the propriety of the method of the Commissioner's determination of his taxable income for the year in issue. Even if he had, section 446 confers upon the Secretary broad authority to compute a taxpayer's income in such circumstances, and we have expressly approved the use of Bureau of Labor Statistics. Giddio v. Commissioner,54 T.C. 1530, 1533 (1970). Accordingly, *218 the Commissioner's determination of Kenneth Smith's 1976 taxable income is sustained. Robert May
The Commissioner also determined that petitioner Robert May realized $40,000 of long-term capital gain resulting from the sale of real property during the taxable year 1979. Respondent asserts that, because the sales price of this real property was $40,000 and petitioner offered no definitive proof of his basis in said capital asset, the entire amount of gain must be recognized. Petitioner contends that his oral testimony that his basis in this parcel was $34,500 refutes the Commissioner's determination. Petitioner offered no other proof on this issue. After observing the demeanor of this witness during his testimony, we do not accept his oral declaration that his basis in this parcel was $34,500. [6] Petitioner had the opportunity at trial to introduce definitive evidence of his basis, such as the closing statement associated with his purchase of the real property. He declined to do so. We, therefore, hold that petitioner has failed to establish his bais in this property and, therefore, sustain the Commissioner's determination. *219 Harold Johnston and Josephine Johnston
The Commissioner determined that these petitioners received $758 of interest income from the Internal Revenue Service and Eastern Air Lines during the taxable year 1979 which they failed to include on their return for that year. The Commissioner also determined that they received $790 of income from an insurance company which they failed to include on their 1979 return. Neither party addressed these issues in their briefs. The parties stipulated that these petitioners received interest income from Eastern Air Lines Employees Federal Credit Union during the taxable years 1977, 1978 and 1979 in the amounts of $584.45, $458.58 and $565.15, respectively, yet respondent did not seek to increase the deficiencies for the taxable years 1977 and 1978 nor seek to amend the pleadings to conform to the proof. Neither party introduced any other evidence concerning this issue. The Commissioner's determinations are presumptively correct, Welch v. Helvering,290 U.S. 111, 115 (1933), and petitioners bear the burden of proving them to be erroneous. Rule 142(a). Due to the petitioners' failure to introduce any evidence *220 concerningtheir income during the taxable year 1979, the Commissioner's determinations are sustained. Rule 142(a). With respect to the taxable years 1977 and 1978, the parties stipulated that petitioners received interest income in the amounts of $584.45 and $458.58, respectively.These amounts were not reported on petitioners' Federal income tax returns. The Commissioner made no determinations concerning these items and respondent did not seek to increase the deficiencies for these taxable years nor seek to amend the pleadings to conform to the evidence. Accordingly, as we have already sustained all of the other determinations by the Commissioner for these taxable years, we are without jurisdiction to redetermine petitioners' deficiencies for these taxable years in amounts in excess of the amounts contained in the statutory notices of deficiency. Sec. 6214(a). Michael Barton
The Commissioner determined that petitioner Michael Barton realized taxable income of $11,122 for each of taxable years 1976 and 1977, an amount computed utilizing Bureau of Labor Statistics. Petitioner contends that because he worked only for Calvary Temple Church as a minister during these years, *221 he had no taxable income. Respondent contends petitioner introduced no evidence to refute the Commissioner's determinations. The Commissioner's determinations are presumptively correct, Welch v. Helvering,supra, and petitioner has the burden of proving them to be erroneous. Rule 142(a). The record does not support petitioner's claim that he served as a minister during the years in issue. Although petitioner may hold strong religious beliefs, the record reveals that his primary duties associated with Calvary Temple were the operation of its printing machines and the printing of the forms associated with the formation of the various "religious orders." Accordingly, we hold that petitioner has failed to carry his burden of proof, and we sustain the Commissioner's determination that Michael Barton received taxable income during the years in issue. Rule 142(a). Robert E. McCurry and Evelyn E. McCurry
The final determination of taxable income concern petitioners Robert E. McCurry and Evelyn E. McCurry, his wife.For the taxable year 1976, the Commissioner determined that petitioner Robert E. McCurry had taxable income in the amount of $14,830. *222 For the taxable year 1977, the Commissioner determined that petitioners Robert E. McCurry and Evelyn E. McCurry realized taxable income of $15,483 each. These determinations are based upon Bureau of Labor Statistics, and the resulting income tax liabilities were computed as though each petitioner had filed a separate return for the years in issue. Respondent now concedes in his briefs that these determinations are erroneous and seeks only to include in petitioners' income the $125 and $100 weekly allowances provided petitioners Robert E. McCurry and Evelyn E. McCurry, respectively. In support of this argument, he contends section 61(a) requires the inclusion in income of "all income from whatever source derived" unless a specific statutory exclusion is present. Petitioners contend that they had no taxable income during the years in issue pursuant to section 107. We agree with respondent that section 61(a) requires that these weekly allowances be included in petitioners' incomes unless they establish that these sums should be excluded under another provision of the Internal Revenue Code. Section 107 provides: SEC. 107. RENTAL VALUE OF PARSONAGES. In the case *223 of a minister of the gospel, gross income does not include-- (1) the rental value of a home furnished to him as part of his compensation; or (2) the rental allowance paid to him as part of his compensation, to the extent used by him to rent or provide a home. Respondent conceded during trial that petitioner Robert E. McCurry was a minister of the gospel. During the years in issue, both petitioners devoted all of their time and effort to Calvary Temple which, in turn, directly paid the expenses for their residence, furnishings, utilities, food, automobile, entertainment and medical and life insurance. Petitioners Robert E. McCurry and Evelyn E. McCurry also received $125 and $100 per week, respectively, during the years in issue for "expenses." Neither individual maintained any records of how these weekly allotments were spent. The Commissioner's determinations are presumptively correct, Welch v. Helvering,supra, and petitioners have the burden of proving them to be erroneous. Rule 142(a). Petitioners have not substantiated that any of their weekly allowances were used "to rent or provide a home." In fact, the record reveals that Calvary *224 Temple directly paid for such expenses. Moreover, the regulations require that prior to payment of a rental allowance, the employing church must designate the rental allowance in an employment contract or other appropriate instrument so as to clearly identify the portion of the minister's salary that is the rental allowance. Sec. 1.107-1(b), Income Tax Regs. As petitioners had no written agreement with the church concerning this matter, they have failed to comply with the regulations.Accordingly, for the years in issue, we hold that the weekly allowances received by petitioners must be included in their gross incomes. Section 61(a). Issue 2. Charitable Contribution Deductions
The next issue for decision is whether any of the petitioners is entitled to a charitable contribution deduction under section 170(c) for their contributions to Calvary Temple Church for any of the years in issue. Petitioners generally contend that because they made "irrevocable gifts" of their current and future real and personal property to their respective "religious orders," which are designated as "integrated auxiliaries of Calvary Temple," they should be allowed their claimed *225 charitable contribution deductions. Further, in determining whether the requirements of this section are satisfied, they argue that any examination of the church's religious tenets is inappropriate provided these tenets were adopted in good faith. Finally, they argue generally that respondent's disallowance of their claimed charitable contribution deductions is part of a concerted effort to harass and discriminate against non-traditional churches. In support thereof, they contend that respondent utilizes more lenient standards when examining claimed charitable contribution deductions to established churches, such as those associated with the Catholic religion, as opposed to claimed charitable contribution deductions to non-traditional churches such as Calvary Temple. They also assert that respondent further discriminates against non-traditional churches by denying charitable contribution deductions for contributions to Calvary Temple because its officials and members comment on various church-state issues, yet respondent fails to deny similar deductions for contributions to Catholic churches when church officials have publicly sought to ban abortions and nuclear weaponry. *226 Respondent initially contends that petitioners have failed to substantiate all of their claimed charitable contribution deductions stemming from the establishment of petitioners' respective "religious orders" and the execution of the aforesaid "Irrevocable Gifts and Vow of Poverty" forms with respect to their current and future real and personal property. He further contends that, even if petitioners have made substantiated contributions to Calvary Church, petitioners have still failed to prove that these sums were received and retained by Calvary Temple or that Calvary Temple treated these amounts as charitable contributions. Finally, respondent asserts that petitioners have failed to prove that Calvary Temple qualified as a charitable donee within the purview of section 170(c) as: (1) Calvary Temple was not operated exclusively for an exempt purpose; (2) a part of the net earnings of Calvary Temple inured to the benefit of private individuals; and (3) a substantial part of the activities of Calvary Temple constituted attempts to influence legislation. We initially observe that petitioners have generally claimed charitable contribution deductions on their returns for *227 the years in issue (at least those petitioners who actually filed valid returns for such years) in amounts equal to or in excess of their entire incomes for such taxable years. Section 170(b)(1)(A)(i) limits the charitable contribution deduction available to an individual to 50 percent of the individual's contribution base which section 170(b)(1)(E) [now section 170(b)(1)(F)] defines to be the adjusted gross income without regard to any net operating loss carryback. Therefore, our discussion herein will relate only to the amount qualifying for the deduction and not any sums equal to or in excess of petitioners' respective salaries for that taxable year. The relevant part of section 170 provides: SEC. 170. CHARITABLE, ETC., CONTRIBUTIONS AND GIFTS. (c) Charitable Contribution Defined.--For purposes of this section, the term "charitable contribution" means a contribution or gift to or for the use of-- * * * (2) A corporation, trust, or community chest, fund, or foundation-- (A) created or organized in the United States or in any possession thereof, or under the law of the United States, any State, the District of Columbia, or any possession of the United States; (B) *228 organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, or to foster national or international amateur sports competition (but only if no part of its activities involve the provision of athletic facilities or equipment), or for the prevention of cruelty to children or animals; (C) no part of the net earnings of which inures to the benefit of any private shareholder or individual; and (D) which is not disqualified for tax exemption under section 501(c)(3) by reason of attempting to influence legislation, and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of any candidate for public office. In order for a taxpayer to have made a charitable contribution within purview of section 170(c), he must have surrendered dominion and control over the item in question and this determination must be based upon all of the facts of a particular case. DeWitt v. United States,204 Ct. Cl. 274 (1974). In the instant case, petitioners have failed to satisfactorily demonstrate that they relinquished dominion and control over *229 their present and future real and personal property when they executed the aforesaid "Irrevocable Gift and Vow of Poverty" forms concerning their respective "religious orders." Petitioners continued to use the real and personal property they allegedly assigned to their respective "religious orders" in the same manner after the execution of these forms as they had prior to the execution of these forms. Further, in many instances, title to various automobiles andparcels of real property did not change after the alleged contributions were made. [7] Finally, in many instances, petitioners actually listed their incomes, automobiles and homes on various credit applications in their individual capacity which further indicates that they did not feel they had relinquished control and dominion over these items. Accordingly, no valid charitable contributions resulted from petitioners' execution of the "Irrevocable Gift and Vow of Poverty" forms. DeWitt v. United States,supra.
We have, however, found *230 that various petitioners did, in fact, make contributions of specific sums of money to Calvary Temple Church during some of the years in issue. We must then decide whether any of these sums qualifies as a charitable contribution deduction within the purview of section 170(c). Petitioners bear the burden of proving that the recipient qualified under section 170(c)(2). McGahen v. Commissioner,76 T.C. 468, 481 (1981), affd. without published opinion 720 F.2d 664 (3d Cir. 1983). We note that petitioner Pastor McCurry has never permitted the church's books and records to be examined by Internal Revenue Service personnel and has refused to comply with numerous document requests with respect to the church during pre-trial discovery. He also refused to comply with a subpoena issued by this Court. Petitioners' only evidence that the church was a qualified recipient under section 170(c)(2) was the oral testimony of several petitioners on this matter. These individuals, including petitioner Pastor McCurry, have a vested interest in assuring a favorable determination. We do not, however, accept their unsubstantiated testimony that Calvary Temple *231 Church is a charitable donee within the purview of section 170(c), and accordingly hold that petitioners have failed to carry their burden of proving that their contributions to Calvary Temple Church satisfied the requirements of section 170(c). Rule 142(a). Given this holding, we need not decide whether Calvary Temple Church is disqualified for tax exemption under section 501(c)(3) by reason of attempting to influence legislation or by participating in any political campaign on behalf of any candidate for public office. Petitioners' claims of discriminatory treatment were first presented in detail in petitioners' Reply Brief and are, therefore, clearly untimely. Rule 34(b)(4). There is no evidence in the record to support such claims. See Greenberg's Express, Inc. v. Commissioner,62 T.C. 324 (1974). Issue 3. FICATaxes
The next issue for decision is whether petitioners are liable for Federal Insurance Contributions Act (FICA) taxes for any of the years in issue. As set forth in the Findings of Fact, many of the petitioners filed claims for refund of FICA taxes withheld from their wages during the years in issue. On these claims and *232 in their respective petitions, they generally contend that they have no liability for FICA taxes because they are members of a religious order. Petitioners do not further address this issue in their briefs.Respondent also does not address this issue in his brief. In this context, we have previously held that we are without jurisdiction to decide whether FICA taxes have been erroneously withheld. Chatterji v. Commissioner,54 T.C. 1402 (1970); see Judd v. Commissioner,74 T.C. 651, 653 (1980). Accordingly, as we are a court of limited jurisdiction, we cannot decide this issue. Issue 4. Self-Employment Taxes
The next issue is whether petitioners Robert E. McCurry, Kenneth Smith and James Thompson are liable for self-employment taxes for any of the years in issue. Petitioners contend that they are not liable for self-employment taxes as members of religious orders. Petitioners' argument does not include any discussion of the applicable Internal Revenue Code sections. Respondent contends that although ministers may obtain an exemption from self-employment taxes by timely filing an exemption application pursuant to section *233 1402(e), petitioners' failure to do so for all of the years in issue requires us to sustain the Commissioner's determinations, citing, among other cases, Ballinger v. Commissioner,78 T.C. 752 (1982), affd. 728 F.2d 1287 (10th Cir. 1984). Respondent further asserts that petitioners Kenneth Smith and James Thompson were not ministers but were self-employed as a subcontractor and a salesman, respectively, during the years in issue. We agree that petitioners' failure to file exemption applications from self-employment taxes pursuant to section 1402(e) for any of the years in issue requires us to sustain the Commissioner's determinations.Sec. 1.1402(e)-3A(a)(1), Income Tax Regs. We have previously held that such filing requirements are mandatory and must be strictly complied with to avail oneself of the exemption provision. Ballinger v. Commissioner,78 T.C. at 757.Therefore, we need not decide whether any of these petitioners could have qualified as a minister and, accordingly, sustain the Commissioner's determinations. Issue 5. Social Security Tax Deductions The next issue is whether petitioners Alan Egerdahl, *234 Eric Pollard and Phillip Thomason are entitled to deductions for social security taxes allegedly erroneously withheld. Petitioners contend that if they are correct in "their claim[s] that they should be excluded from social security taxes as members of religious orders, then they should receive credit for deductions erroneously withheld." Respondent asserts that there is no provision in the Internal Revenue Code for the deduction of social security taxes; hence petitioners' claim is frivolous. In New Colonial Ice Co. v. Helvering,292 U.S. 435, 440 (1934), the Supreme Court held that "[w]hether and to what extent deductions shall be allowed depends upon legislative grace; and only as there is clear provision therefor can any particular deduction be allowed." Given that there is no specific provision in the Internal Revenue Code for the deduction of social security taxes, the Commissioner's disallowance of petitioners' deductions must be sustained. New Colonial Ice Co. v. Helvering,supra.
Issue 6. Additions to Tax The final issue is the additions to tax imposed by the Commissioner pursuant to sections 6651(a)(1), 6653(a) and *235 6654. Petitioners have the burden of proving that any additions to tax set forth in their statutory notices are improper. Axelrod v. Commissioner,56 T.C. 248, 258 (1971); Rule 142(a). The first category of additions to tax are those imposed pursuant to section 6651(a)(1) for failure to timely file Federal income tax returns for the years in issue. With respect to those petitioners who filed otherwise valid returns tardily, no explanation or proof was offered to show that their failure to timely file such returns was due to reasonable cause and not due to willful neglect. Accordingly, those petitioners have failed to carry their burden of proof, and the Commissioner's determinations are sustained. Rule 142(a). With respect to those petitioners who filed Forms 1040, U.S. Individual Income Tax Returns, with various constitutional objections typed in the blanks requesting financial data, the law is clear that such documents do not constitute valid returns and the imposition of additions to tax for such filings is appropriate when, are here, no reasonable justification is offered for the filing of such documents. Thompson v. Commissioner,78 T.C. 558, 562-563 (1982). *236 Finally, with respect to those petitioners who did not file any returns for the years in issue, no reasonable explanation was offered for their actions. Therefore, these petitioners have failed to carry their burden of proof and the Commissioner's determinations are sustained. Rule 142(a). The second category of additions to tax are those imposed pursuant to section 6653(a) for the underpayment of tax as the result of negligence or the intentional disregard of rules and regulations. Again, the burden of proving that no part of the underpayments was due to negligence is upon petitioners. Rosano v. Commissioner,46 T.C. 681, 688 (1966); Rule 142(a). Petitioners offered no proof on this issue. Accordingly, the Commissioner's determinations are sustained. Rule 142(a). The final category of additions to tax are those imposed pursuant to section 6654 for failure to pay estimated income tax. Petitioners bear the burden of proving the Commissioner's determinations to be erroneous. Many of the petitioners filed forms with their employers claiming excessive allowances for the years in issue. Petitioners offered no proof on this matter; hence the Commissioner's *237 determinations are sustained.Rule 142(a). Finally, although many of the petitioners have sought an award of attorney fees and costs, this Court cannot lawfully grant such relief in the immediate proceedings. [8] Moreover, taxpayers are not entitled tolitigation costs unless they prevail. Decisions will be entered for the respondent in docket Nos. 9634-78, 12467-79, 13797-79, 5137-80, 5209-80, 11203-80, 11204-80, 11326-80, 11557-80, 12091-80, 3329-81, 7482-81, 25426-81, 25428-81, 25496-81, 25610-81, 25615-81, 7530-82, 12738-82, 19015-82, 19263-82, 19272-82, 19281-82, 19285-82, 19291-82, 19833-83, 19887-82, 1945-83, 2042-83, 2138-83, and 2178-83. Decisions will be entered under Rule 155 in Docket Nos. 15293-80 and 15294-80.
Footnotes
1. Cases of the following petitioners were consolidated herewith for trial, briefing and opinion: Kenneth R. Smith, docket No. 12467-79; John Wesley Foshee, Jr., docket No. 13797-79; Phillip R. Brooks and Sharon O. Brooks, docket No. 5137-80; David D. Sutton, docket No. 5209-80; Larry McEver, docket No. 11203-80; Harold H. Johnston and Josephine E. Johnston, docket No. 11204-80; James F. Thompson, docket No. 11326-80; Michael W. Barton, docket No. 11557-80; Robert E. Dollar, Jr. and Linda Dollar, docket No. 12091-80; Robert E. McCurry, docket No. 15293-80; Evelyn E. McCurry, docket No. 15294-80; Robert D. McCurry and Phyllis E. McCurry, docket No. 3329-81; Robert D. May and Jeanne W. May, docket No. 7482-81; Harold H. Johnston and Josephine E. Johnston, docket No. 25426-81; Phillip R. Brooks and Sharon O. Brooks, docket No. 25428-81; Roger D. Schroeder and Nancy L. Schroeder, docket No. 25496-81; James F. Thompson, docket No. 25610-81; Philip D. Thomason, docket No. 25615-81; Robert D. May, docket No. 7530-82; David D. Sutton, docket No. 12738-82; Phillip R. Brooks, docket No. 19015-82; Robert E. Dollar Jr., Docket No. 19263-82; Eric A. Pollard, docket No. 19272-82; Harold H. Johnston and Josephine Johnston, docket No. 19281-82; Roger D. Schroeder and Nancy L. Schroeder, docket No. 19285-82; Philip D. Thomason and Anita J. Thomason, docket No. 19291-82; Alan D. Egerdahl and Karen L. Egerdahl, docket No. 19833-82; James F. Thompson, docket No. 19887-82; Philip D. Thomason and Anita J. Thomason, docket No. 1945-83; Phillip R. Brooks and Sharon Brooks, docket No. 2042-83; Robert D. McCurry, Sr. and Phyllis E. McCurry, docket No. 2138-83; and Eric A. Pollard and Lee F. Pollard, docket No. 2178-83.↩
2. All section references are to the Internal Revenue Code of 1954, as amended and in effect for the years in issue, and all rule references are to this Court's Rules of Practice and Procedure.↩
3. Although we may, for convenience, refer to these groups as "religious orders," we decline to find as a fact that they are, indeed, religious orders as that term is used in the Internal Revenue Code and attendant regulations.↩
4. The latest revenue ruling pertaining to vows of poverty is Rev. Rul. 84-13, 1984-4 I.R.B. 5↩.
5. An even greater factual similarity exists between petitioners and the taxpayers in Greeno v. Commissioner,T.C. Memo. 1981-521↩, especially concerning the forms associated with the creation of various "orders." In that case, we also rejected the taxpayers' agency argument.
6. In fact, petitioners' reply brief now contends that his basis in this property is $29,509.80.↩
7. We do not imply, however, that a mere change in title, in and of itself, is sufficient to constitute an effective relinquishment of dominion and control.↩
8. Although this Court can award attorney fees and costs pursuant to section 7430 in actions commenced after February 28, 1983, it has no similar authority with respect to proceedings begun prior to that date. McQuiston v. Commissioner,78 T.C. 807 (1982), affd. without published opinion 711 F.2d 1064↩ (9th Cir. 1983).